Thomas L. CLEVENGER, Appellant,

v.

PLEXCO, DIVISION OF AMSTEAD INDUSTRIES, INC., and the Insurance Company of North America, Inc., Appellees.

Supreme Court of Tennessee.

April 13, 1981.

George M. Johnson, David A. Burkhalter, Knoxville, for appellant.

John W. Baker, Jr., Poore, Cox, Baker, Ray & Byrne, Knoxville, for appellees.

OPINION

FONES, Justice.

This is a direct appeal by plaintiff, employee, from a trial court judgment denying worker's compensation benefits.

Plaintiff contends that he was given a harsh reprimand and an ultimatum to improve or be fired by defendant's, employer's, production foreman; that such treatment was unexpected, undeserved, and so upsetting that it precipitated a nervous breakdown; that those circumstances were sufficient to amount to a compensable "accident" under *Jose v. Equifax, Inc.*, 556 S.W.2d 82 (Tenn.1977). We affirm the judgment of dismissal.

The incident that plaintiff asserts as a compensable "accident" occurred on September 29, 1977. There is a sharp conflict in the evidence about what occurred at that time. However, there is little conflict about plaintiff's problems that preceded the alleged "accident."

On May 15, 1977, plaintiff was hospitalized under the care of Dr. Paul M. Watson. The history recorded by Dr. Watson was that he had fallen at home and sustained a blow to the head, was suffering from nervous anxiety, was under pressure at work and had domestic problems at home, had a violent temper, headaches, blurred vision and nausea. Dr. Watson's diagnosis was cerebral concussion, anxiety reaction, and neurodermatitis. Plaintiff was discharged from the hospital on June 3, 1977, and readmitted on June 6 because of a severe recurrence of Horton's Cyclic Headache. Dr. Watson explained that plaintiff was given high doses of steroids, a cortisone like drug, for headache, and he developed steroid psychosis, which makes one wild and uncontrollable. Plaintiff was taken off steroids and given a mild tranquilizer. He also had "some nervousness and some psychiatric problems that had not been resolved" when Dr. Watson discharged him on June 8, 1977. Dr. Watson said that at the time his psychiatric problems were related to pressure at home and domestic difficulties.

He was divorced in 1975, but he and his former wife resumed living together, but she had left him approximately one week prior to his fall on May 15, 1977. She testified and confirmed that he had a drinking problem, violent temper, and that he beat her on occasion.

Plaintiff was hospitalized a third time in June, 1977, and was apparently discharged on June 23. Dr. Watson's testimony was not clear on the dates of the third hospitalization, nor the cause. Plaintiff had an automobile accident that apparently precipitated that hospitalization, but his problems continued to be headaches and tension and were psychological in origin. On June 30, 1977, he was treated in the emergency room of Park View Hospital where the record revealed that plaintiff reported that his brother hit him three times in the head with a billy stick.

Plaintiff went to Dr. Watson on July 7, and July 20, and was found to be suffering from tension headaches. He returned on August 19, and August 26. Dr. Watson testified that on August 26, plaintiff reported that he was having trouble getting along with his boss and couldn't take the pressure at work anymore. Testifying about the August 26, visit and his advice that plaintiff take a three week leave of absence from his work, Dr. Watson said that plaintiff had shown violent symptoms at home, knocked holes in the wall, beat his wife, had extreme temper tantrums, had reported that he was having difficulty getting along with his boss, and couldn't take the pressure at work anymore.

Plaintiff's next visit to Dr. Watson was on September 20, 1977. Dr. Watson's notes revealed that plaintiff said he wanted to be checked to see how he was doing, having been off from work three weeks. Dr. Watson found that he had been drinking too many beers and was having problems at home. Dr. Watson advised him to discontinue the use of alcohol, prescribed a decrease in one of the drugs that he was taking that made him sleepy, and told plaintiff to continue with his previous medication and return in two weeks. Dr. Watson was asked when he next saw plaintiff, and he replied, "October 4, 1977," when plaintiff reported that he was "feeling somewhat better." Testifying further about the October 4, 1977, visit, Dr. Watson said,

"he was sleeping a lot better with Elavil and seeming to be a lot calmer at that particular visit than on previous occasions. We saw him again on October 14, 1977."

Dr. Watson reported his findings on October 14, and his findings on a subsequent visit, October 26, 1977, were made without any mention of a nervous breakdown.

Later, he was asked to identify a letter dated September 30, 1977, which he did, and testified that he wrote the letter at plaintiff's request. The letter reads as follows:

"To Whom It May Concern:

This is a letter regarding Thomas Clevenger. I have seen him three times within the past three weeks, and he has reached the point where I believe he is on the verge of a nervous breakdown.

Because of both physical and emotional stress of long hours at work and other work related stress, I have advised him that he should have a leave of absence for one month. Because of the nature of his work, it may be advisable for him to possibly switch to another type of employment. I intend to reevaluate him at weekly intervals and the above point will be determined according to his potential and progress.

Sincerely yours,
Paul M. Watson, M.D."

Dr. Watson then observed that a word of explanation was in order; that he had previously been testifying from his notes and that although the letter said he had seen plaintiff only three times in the preceding three weeks, plaintiff had called him at home frequently and he had seen him at the emergency room on a "personal" basis during this "particular period of stress that he was under." He was then asked and answered as follows:

"Q Do you recall when you saw him at the emergency room?

A I don't recall any date. I do remember this particular time that he was having a great deal of difficulty at his work and he felt he would either get fired or else have to change his employment, or else he was going to 'kill somebody' that I thought it was necessary to write this letter so that it would avoid some problems for him."

Next, Dr. Watson said that at the time he wrote the letter, September 30, 1977, plaintiff was "on the verge of a nervous breakdown," then later was asked and answered as follows:

"Q Doctor, based upon the history that was given to you by Mr. Clevenger, do you have an opinion as to a reasonable medical certainty whether or not his nervous breakdown was caused or related to his employment?

[Objection omitted.]

A There are many other causes for it, of course, and this was one of the causes. You might say this was sort of the straw that broke the camel's back. There are other causes admittedly in all honesty, but this certainly is one that probably precipitated his immediate nervous breakdown on this particular occasion."

Plaintiff's version of the September 29, 1977, incident relied upon as a compensable "accident" differs from that of the other three participants.

Plaintiff testified that Plexco was engaged in the manufacture of profile extrusions, laboratory tubing, instrumentation tubing, gas pipe and gas tubing; that he was a shift foreman at the time of the alleged incident, having worked for Plexco ten years, during which time the company had more than tripled in production, employees, etc. Nine men worked under plaintiff and he was responsible for four extruders. His assistant was Clifford Sharp, who was called a "relief operator". Apparently both plaintiff and Sharp were required to relieve the machine operators when they were entitled to "breaks," and their major duties were to keep the machines operating and producing. When plaintiff was on his break or was absent or on vacation, Sharp took his place as shift foreman. Dwight Sherwood was plaintiff's foreman, and Charlie Brown was General Production Foreman.

Plaintiff testified, in substance, that on September 29, at about 9:30 or 10:00 a. m., Dwight told him that he was wanted in Charlie Brown's office; that in the presence of Clifford and Dwight, Brown informed him that Clifford had reported that he was not giving proper help on relieving the machine operators for breaks and that in fact plaintiff was not helping Clifford at all; that Brown cursed him and said he was not going to put up with that sort of [expletive] thing and if plaintiff did not start doing his job he would be replaced; and that he was not allowed to tell his side or say anything in his defense.

Plaintiff testified that he was taken by surprise, that he had been "giving it everything I had," and that all of a sudden the rug was jerked out from under him; that after the meeting he told Dwight he wanted to go see his doctor; and that he found Dr. Watson in the emergency room at the hospital and they went into the conference room where they had a long talk. Plaintiff testified that he had not been gainfully employed since that day, and although he had tried carpentry and assorted other types of work, he could not successfully accomplish anything.

According to Sharp, Sherwood, and Brown, plaintiff's work performance had been erratic and deficient for many months prior to the meeting, and in addition he had been frequently absent since May for lengthy periods of time. Sharp said that he told Sherwood on the twenty-ninth, as he told him at least twice before, that plaintiff was not doing his job, that he was spending too much time on breaks and leaving all the work to him; that the meeting in Brown's office was calm; that Dwight told plaintiff that all he wanted to do was argue, and that Brown told plaintiff he was going to have to straighten up or else.

Sherwood described the meeting as follows:

"We all went in Charlie Brown's office and I presented these charges Clifford made of Tom and added that I agreed, he hadn't been performing his job up to par since his leave of absence, since his injury to his head, and that there were several problems that needed to be improved.

. . . .

Well, we told Tom that we expected him to improve on these points that we brought out as far as closer supervision and more training and treating everyone fairly, including Clifford. And Tom disagreed with us on several of these points. In fact he didn't agree that he had this problem.

Q These points that you have made, were they essential to the smooth operation of the pipe siding?

A Yes, they were and we discussed this several minutes with Tom. I don't exactly remember how long, but we again went over these points, and Tom still didn't agree that he needed to improve on any of these. So, finally Charles Brown told him that he had two weeks to show improvement or he would be relieved of his job."

Brown, under questioning by plaintiff's lawyer, described the meeting as follows:

A On that particular occasion, Dwight, Cliff, Tom and I all sat down in Dwight's office; and we heard both sides of the situation.

Q From Clifford and from Tom?

A Right. And I told Tom that I had to see some improvement from him within a couple of weeks."

After a number of questions about Brown's policy or practice with respect to correcting men in the presence of their subordinates, the interrogation continued as follows:

Q But you did correct Tom in front of his inferior?

A On this one occasion, yes.

Q Was there any particular reason why you chose this one occasion?

A Yes, because I had had so damn much problems with him that I was fed up with it.

Q You were fed up with Tom?

A Right.

Q Did you come down on him on that occasion?

A   I told you just what I have related, that I told him I had to see some improvement within a couple of weeks. If that is coming down, that's coming down.

. . . .

Q   Was there an argument?

A   Tom, to the best of my recollection, said okay; and we ended the meeting, and Tom says, 'Would it be all right if I leave a while? I have got to get out and drive around a couple of hours.' I said okay.

The relevant findings of the trial judge were as follows:

"I just don't think that this one confrontation even in the condition in which Mr. Clevenger was constitutes an industrial accident under the scope of our workmen's compensation. It is my opinion that Mr. Clevenger was already disabled on or about this incident due to the trauma of his fall, his problem or fight with his brother, marital problems, excessive drinking. I think that's the day his employer found out about it. I think he was already disabled, and I think his employers found out about it.

He realized they found out, so his disability, I think, springs from things other than this purported traumatic experience. For that reason the Court finds that plaintiff has failed to carry the burden of proof in this case and this matter will be dismissed."

There is an abundance of evidence in this record to support the trial judge's finding that plaintiff's condition was caused by factors other than his employment.

Further, if we gave full faith and credit to plaintiff's version of the September 29, meeting, it would not qualify as the kind of mental stimulus, fright, or shock contemplated in *Jose v. Equifax, Inc., supra.* Rather, the incident described by plaintiff falls within our observation in *Jose* that under our statutes, "injury by accident" does not embrace "every stress or strain of daily living or every undesirable experience encountered in carrying out the duties of a contract of employment."

The decree of the Circuit Court of Knox County Tennessee is affirmed. Costs are adjudged against plaintiff.

HARBISON, C. J., and COOPER, BROCK and DROWOTA, JJ., concur.